1

2

3

4

5

6                                                          The Honorable Marsha J. Pechman

7

8                    **UNITED STATES DISTRICT COURT**
                     **WESTERN DISTRICT OF WASHINGTON**
9                              **AT SEATTLE**

10   WASHINGTON ENVIRONMENTAL            Case No.  2:11-cv-00417-MJP
     COUNCIL and SIERRA CLUB
11   WASHINGTON STATE CHAPTER,

12                   Plaintiffs,          DEFENDANT AGENCIES'
                                          OPENING BRIEF ON REMEDY
                                          PHASE
13        v.

14   THEODORE ("TED") L.
     STURDEVANT, DIRECTOR,
15   WASHINGTON STATE
     DEPARTMENT OF ECOLOGY, in his
16   official capacity, MARK ASMUNDSON,
     DIRECTOR, NORTHWEST CLEAN
17   AIR AGENCY, in his official capacity,
     and CRAIG T. KENWORTHY,
18   DIRECTOR, PUGET SOUND CLEAN
     AIR AGENCY, in his official capacity,
19
                     Defendants,
20
          and
21
     WESTERN STATES PETROLEUM
22   ASSOCIATION,

23                   Intervenor-Defendant.

24

25

26

DEFENDANT AGENCIES' OPENING              ATTORNEY GENERAL OF WASHINGTON
BRIEF ON REMEDY PHASE                              Ecology Division
C11-417-MJP                                         PO Box 40117
                                                 Olympia, WA 98504-0117
                                                    (360) 586-6770

# I.    INTRODUCTION

The Court has ordered the Defendant Clean Air Agencies to make reasonably available control technology (RACT) determinations for greenhouse gases from refineries. The Court has requested briefing on how long it will take the Agencies to make these determinations.  This brief and its accompanying declarations[1] outline the multi-step process required by law for making RACT determinations for the five refineries located in Washington.   As these facts demonstrate, RACT is a highly technical, labor-intensive enterprise.

The first step in the multi-step process entails "information collection" which includes the gathering of information from the refineries about their numerous emission units (which number in the hundreds) and the various air pollutants being emitted from those units.  The information collection stage also entails determining the pollution controls in place on each emission unit for each pollutant of concern and identifying the universe of regulations that already apply to the refineries and the regulations that will apply in the near future.  These steps are described in the declarations of Mark Asmundson, at paragraphs 10 through 31, and Stuart Clark, at paragraphs F and G.

After acquiring the necessary information, the Clean Air Agencies would begin the analytical process of deciding what constitutes RACT for each emission unit at each refinery. This involves an in-depth engineering analysis of the potential control technologies available for each type of emission unit, including air dispersions modeling and a cost-effectiveness analysis.   These steps are described in Mark Asmundson's declaration at paragraphs 32 through 43.

Next, Washington State Department of Ecology (Ecology) toxicologists would review the emission control strategies to determine that they are appropriate from a human health and

---

[1] To support factual statements made in this brief, the Agencies have filed the accompanying declarations of Mark Asmundson (Northwest Clean Air Agency), Steve Van Slyke (Puget Sound Clean Air Agency), Stuart Clark (Department of Ecology), and Bari Schreiner (Department of Ecology).

DEFENDANT AGENCIES' OPENING
BRIEF ON REMEDY PHASE
C11-417-MJP

1

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
(360) 586-6770

1  risk perspective.  This is important because of the way that different control technologies

2  interact.  Specifically, decreases in some air pollutants (like greenhouse gases) may have the

3  effect of increasing other air pollutants that could have acute and chronic health effects.  This

4  is described in Mark Asmundson's declaration at paragraph 44.

5  Next, the Agencies would develop a matrix tool to assess and compare the various

6  control technologies for each unit at each refinery.  Due to the number and variety of emission

7  units and the number of pollutants likely to be addressed for each unit, the matrix could frame

8  several hundred decisions among alternative control technologies.  The Agencies will then

9  make their preliminary RACT determinations based on this matrix.  These steps are described

10  in Mark Asmundson's declaration at paragraphs 45 through 48.

11  Pursuant to state law, the RACT determinations then need to be promulgated through

12  a formal, state-wide rulemaking process which will be initiated by Ecology after the

13  information collection stage, but before the Agencies have begun their in-depth engineering

14  analysis.  The rulemaking process will have to meet all of the requirements of the

15  Washington State Administrative Procedure Act (APA).  The steps involved in formal

16  rulemaking are described in Stuart Clark's declaration at paragraphs L through R.

17  After thoroughly assessing the various tasks associated with information collection,

18  engineering analysis, and formal rulemaking, the Clean Air Agencies have concluded that

19  they can complete the RACT determinations for refineries within 26 months.  As outlined in

20  the declarations, the Agencies have assumed an aggressive schedule to complete this work

21  within 26 months and have assumed that they will be able to dedicate the necessary staff to

22  complete the work on this timeframe, despite an unprecedented state budget crisis and

23  concomitant reductions to the budget of Ecology's Air Quality Program.  The Agencies

24  respectfully request the Court give them the time they need to do this task right, which

25  requires a minimum of 26 months.

26

DEFENDANT AGENCIES' OPENING
BRIEF ON REMEDY PHASE
C11-417-MJP

2

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
(360) 586-6770

## II.   STATEMENT OF FACTS AND OVERVIEW OF RACT PROCESS

### A.   RACT Requirements In Washington State Law

Under Washington State law, Wash. Rev. Code 70.94.154 sets out the process by which RACT must be determined for stationary sources of air pollution, including the refineries at issue in this case.  Pursuant to Wash. Rev. Code 70.94.154(3), RACT must be determined by rule unless (1) an individual source is replacing emission control equipment, which must meet RACT; (2) the federal Clean Air Act requires an individual source located in a nonattainment area to meet RACT for the pollutant(s) for which the area is in nonattainment; (3) the source category includes fewer than three sources; (4) an air quality problem, to which a source is a contributor, justifies a source-specific RACT determination prior to development of a categorical RACT rule; or (5) a source-specific RACT determination is needed to address specific air quality problems for which a source is a significant contributor or to address source-specific economic concerns.  If one of the above exceptions is met, RACT may be determined on a source-specific basis and implemented using a RACT order.  Wash. Rev. Code 70.94.154(3).

Thus, under this state statutory scheme, depending upon the circumstances, RACT may be determined by Ecology by state rule or by local air agencies by rule or by order.  Because the five refineries are located within and are currently regulated by the Northwest Clean Air Agency (four refineries) and the Puget Sound Clean Air Agency (one refinery), both local air agencies will be highly involved with establishing RACT for the refineries.  However, because there are five refineries located in Washington and those refineries are located within the jurisdiction of more than one local air agency, Ecology must establish RACT for the refineries in a state-wide rule.

Wash. Rev. Code 70.94.154(4) requires Ecology to, by January 1, 1994, develop a list of sources and source categories requiring RACT review and a schedule for conducting that review.  Ecology must review the list and schedule every five years thereafter.  *Id.*  In

DEFENDANT AGENCIES' OPENING
BRIEF ON REMEDY PHASE
C11-417-MJP

3

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
(360) 586-6770

1    developing the list, Ecology is required to "consider emission reductions achievable through

2    the use of new available technologies and the impacts of those incremental reductions on air

3    quality, the remaining useful life of previously installed control equipment, the impact of the

4    source or source category on air quality, the number of years since the last BACT [best

5    available control technology], RACT, or LAER [lowest achievable emission rate]

6    determination for that source and other relevant factors."  Wash. Rev. Code 70.94.154(4).

7         In determining RACT for a source or source category, the implementing agency must

8    take into account the impact of the source upon air quality, the availability of additional

9    controls, the emission reduction to be achieved by additional controls, the impact of additional

10   controls on air quality, and the capital and operating costs of the additional controls.  Wash.

11   Rev. Code 70.94.154(5), *citing* Wash. Rev. Code 70.94.030.  When determining RACT, the

12   agency must also consider RACT determinations and guidance made by the federal

13   Environmental Protection Agency (EPA), other states and local authorities for similar sources,

14   and "other relevant factors."  Wash. Rev. Code 70.94.154(5).  The agency must also consider

15   any physical constraints on the ability of a source to comply with the applicable standard

16   during startup or shutdown.  Wash. Admin. Code 173-400-081(1).  RACT requirements may

17   only be adopted after the public has been given notice and the opportunity to comment.  Wash.

18   Rev. Code 70.94.030(20).

19        Finally, pursuant to Wash. Rev. Code 70.94.154(5), in establishing or revising RACT

20   for a source or source category, Ecology and the local air agencies are required to address,

21   "where practicable, all air contaminants deemed to be of concern for that source or source

22   category."

23   **B.    The RACT Process**

24        To meet the requirements in Wash. Rev. Code 70.94.154, the RACT process requires a

25   considerable amount of up-front engineering analysis of the affected source or source category.

26   Engineering staff must evaluate (1) the size of the source facility, the specific industrial

DEFENDANT AGENCIES' OPENING                    4              ATTORNEY GENERAL OF WASHINGTON
BRIEF ON REMEDY PHASE                                                        Ecology Division
C11-417-MJP                                                                  PO Box 40117
                                                                           Olympia, WA 98504-0117
                                                                             (360) 586-6770

1   processes and equipment being used at the source, operating conditions, emission units, and

2   emissions from each emission unit at the source; (2) the contaminants of concern emitted by

3   the source; (3) the currently installed emission controls; (4) available emission reduction

4   technologies; (5) the complexity of retrofitting the available emission controls on the emission

5   units being evaluated; (6) the costs to install the controls; (7) the remaining useful life of the

6   sources and individual emission units in the source category; (8) the impact of the emission

7   controls on air quality; and (9) the capital and operating costs of controls.  Declaration of

8   Stuart Clark in Support of Clean Air Agencies' Remedy Phase Opening Brief (Clark

9   Decl.) ¶ F.

10      This engineering analysis necessarily begins with agency requests to affected sources

11  for the source-specific information delineated above that is required to initiate the RACT

12  analysis.  Clark Decl. ¶ G.  As the RACT analysis proceeds, the agency and the affected

13  sources continue to communicate frequently to clarify and supplement information as needed.

14  *Id*.

15      Once the initial engineering analysis is complete, the agency must make a preliminary

16  determination of what RACT would consist of for the contaminants of concern for the source

17  or source category.

18  **C.    RACT For Refineries**

19      Refineries are exceptionally complex facilities, and as a result, making a RACT

20  determination for the facilities is not a simple undertaking.  The Clean Air Agencies have

21  conferred and, working with their engineers that oversee regulation of the refineries, developed

22  an outline of the tasks that will have to be completed and estimates of the time required to

23  complete each task.  The tasks may be grouped as follows:

24      • Task 1:  Identify the air contaminants of concern and the emission units that will be

25          included in the RACT analysis;

26

DEFENDANT AGENCIES' OPENING
BRIEF ON REMEDY PHASE
C11-417-MJP

5

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
(360) 586-6770

- Task 2: Identify the control technologies available for and applicable to each emission unit;

- Task 3: Evaluate impacts and risks to human health from alternative control methods;

- Task 4: Develop a decision matrix; and

- Task 5: Arrive at preliminary RACT determinations

The first two tasks on this list involve multiple subtasks. Declaration of Mark Asmundson Regarding RACT Process (Asmundson Decl.) ¶¶ 10–48.

Determining which air contaminants and which emission units will be part of the RACT analysis involves a substantial amount of information gathering about the emission units at the refineries, what they emit, and how much they emit. That information will be easier to collect for some emission units and some pollutants than for others. Because greenhouse gases have only recently become regulated air contaminants, little information is available, particularly at the emission unit level, which will be needed for RACT determinations. Asmundson Decl. ¶ 35.

The Washington refineries house multiple processes for breaking down crude oil into its chemical constituents, including distillation processes; hydrotreating and reforming processes for converting distilled fractions to gasoline and other products; and cracking and other processes to upgrade heavier crude oil components into lighter products. Asmundson Decl. ¶ 7. They also include a variety of processes that support or integrate with those basic refining processes, like sulfur removal or recovery units and hydrogen plants, as well as using storage tanks of all shapes and sizes, compressors, heaters, boilers, and a wide variety of pollution control equipment, including flares and wastewater treatment processes. This translates into literally hundreds of stacks, vents, and other release points for air emissions from each refinery. Asmundson Decl. ¶ 21.

DEFENDANT AGENCIES' OPENING
BRIEF ON REMEDY PHASE
C11-417-MJP

6

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
(360) 586-6770

1    The existing regulatory requirements for air emissions from refineries also are

2  exceptionally complex.  The final stage of the first RACT task will include review of those

3  existing requirements.

4    The second RACT task will include examining the control technology assumptions

5  behind existing requirements.  Northwest Clean Air Agency and Puget Sound Clean Air

6  Agency have developed Air Operating Permits for the refineries, which will be a helpful

7  resource for the RACT process.  But they are only a starting point; they document existing

8  emission limits and other applicable requirements, which provide an existing baseline and may

9  guide the engineers as they investigate the assumptions behind existing requirements.[2]

10  Asmundson Decl. ¶ 22.

11    With preliminary determinations regarding the air contaminants of concern, the

12  universe of emission units and their existing control requirements made in the first RACT task,

13  the Agencies will then focus on identifying and evaluating the available control technologies,

14  which are subtasks within Task 2.  In addition to economic and technologic feasibility, this

15  work includes evaluating the tradeoffs between pollutants inherent in many technologies.

16  Asmundson Decl. ¶¶ 40-44.  It also requires an assessment of the potential benefits of

17  incremental emission reductions, including potential health benefits, to compare with the

18  associated costs.  *Id.*

19    Once the basic analysis has been completed, it must be compiled into a decision matrix.

20  The complexity of these facilities and the number and variety of emission units involved

21  necessitates this intermediate step before arriving at preliminary RACT determinations.  *See*

22  Asmundson Decl. ¶ 45.  At this point, the Clean Air Agencies will be able to make their

---

25   [2] The efficiencies that may be derived from those existing permits were taken into account in developing
   the time estimates for completing the refinery RACT determination.  For example, the engineers who developed
26  and oversee those Air Operating Permits helped develop the RACT task list and time estimates set out in
   Mr. Asmundson's declaration.  *See* Asmundson Decl. ¶ 3.

DEFENDANT AGENCIES' OPENING          7          ATTORNEY GENERAL OF WASHINGTON
BRIEF ON REMEDY PHASE                           Ecology Division
C11-417-MJP                                     PO Box 40117
                                                Olympia, WA 98504-0117
                                                (360) 586-6770

1   preliminary determinations, document their analysis, and proceed with the formal rulemaking

2   process.

3          As explained in detail in Mr. Asmundson's declaration, the Clean Air Agencies

4   estimate that these substantive elements of the RACT analysis will take approximately

5   21 months to complete:

6   • Task 1, including all subtasks          6.5 months

7   • Task 2, including all subtasks          10 months

8   • Tasks 3–5                                4.5 months

9   Asmundson Decl. ¶ 54.   Then, as explained in the next section below, an additional five

10  months is needed to satisfy the state's statutory rulemaking requirements.

11  **D.     The Rulemaking Process**

12         As stated above, because there are more than two refineries in Washington, RACT for

13  refineries must be determined by rule unless one of the statutory exceptions is met.   Wash.

14  Rev. Code 70.94.154(2)–(3).   At this time, the Agencies do not have sufficient information to

15  allow them to determine that one of the exceptions applies.   Clark Decl. ¶ J.   Therefore, until

16  and unless source-specific information provides otherwise, the Agencies are proceeding with

17  the understanding that RACT for greenhouse gases from refineries must be set by a state-wide

18  rule issued by Ecology.   *Id.*

19         When developing and implementing RACT rules, Ecology must follow the express

20  processes laid out by Washington's APA, found in chapter 34.05 Wash. Rev. Code.   *See* Wash.

21  Rev. Code 34.05.310–.395.   The rulemaking process begins with issuance of a pre-rulemaking

22  statement of inquiry designed to provide "greater public access to administrative rulemaking

23  and to promote consensus among interested parties" and solicit comments from the public on

24  the subject of the rulemaking.   Wash. Rev. Code 34.05.310(1).   This provision recognizes the

25  value of engaging in a stakeholder process prior to issuance of a proposed rule.   Indeed, there

26

DEFENDANT AGENCIES' OPENING
BRIEF ON REMEDY PHASE
C11-417-MJP

8

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
(360) 586-6770

1   are strict limits on how much a final rule can deviate from a formally proposed rule. *See*
2   Wash. Rev. Code 34.05.340. *See also* Clark Decl. ¶ P.

3       Here, the Agencies believe they will be able to start the stakeholder process after
4   6.5 months, when the first set of tasks outlined in the Asmundson Decl. have been completed.
5   Clark Decl. ¶ M.  From that point forward, the substantive work described above can proceed
6   in parallel with the rulemaking process.

7       Once the stakeholder process is complete, and proposed rule language has been
8   finalized, Ecology must issue a notice of proposed rulemaking.  Wash. Rev. Code 34.05.320.
9   The notice must include not only the language of the proposed rule, but also the agency's small
10   business economic impact statement and a preliminary cost-benefit analysis.  Wash. Rev.
11   Code 34.05.320(1)(j), (l); Wash. Adm. Code 1-21-020(1).  Ecology must then schedule a
12   public hearing at which to receive oral public comment on the proposed rule.  Wash. Rev.
13   Code 34.05.325(2).  After receiving oral and written comments, Ecology must prepare a
14   concise explanatory statement of the rule that (1) identifies its reasons for adopting the rule,
15   (2) describes any differences between the proposed rule and the final rule, along with the
16   reasons for the differences, and (3) summarizes all comments received and responds to those
17   comments, explaining how the final rule reflects agency consideration of the comments, or
18   why it fails to do so.  Wash. Rev. Code 34.05.325(6).  Ecology must also finalize the
19   cost-benefit analysis and the small business economic impact statement to reflect any changes
20   in the final rule.  Clark Decl. ¶ Q.

21       "Significant legislative rules" must meet several additional requirements within the
22   rulemaking process.  Rev. Code Wash. 34.05.328.  A "significant legislative rule" includes a
23   rule promulgated by Ecology "other than a procedural or interpretative rule[3] that (A) adopts

24

25       [3] A "procedural rule" is one that "adopts, amends, or repeals (A) any procedure, practice, or requirement relating to any agency hearings; (B) any filing or related process requirement for making application to an agency for a license or permit; or (C) any policy statement pertaining to the consistent internal operations of an agency." Wash. Rev. Code 34.05.328(5)(c)(i).  An "interpretive rule" is a rule "the violation of which does not subject a

DEFENDANT AGENCIES' OPENING
BRIEF ON REMEDY PHASE
C11-417-MJP

9

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
(360) 586-6770

substantive provisions of law pursuant to delegated legislative authority, the violation of which subjects a violator of such rule to a penalty or sanction; (B) establishes, alters, or revokes any qualification or standard for the issuance, suspension, or revocation of a license or permit; or (C) adopts a new, or makes significant amendments to, a policy or regulatory program." Wash. Rev. Code 34.05.328(5)(a)(i), (5)(c)(iii).  The RACT rule, the violation of which would subject the violator to penalties or sanctions, constitutes a significant legislative rule. Therefore, the additional rulemaking requirements apply to the RACT rulemaking process.

The additional requirements for significant legislative rules include the preparation of an extensive and specific analysis mandated by statute.  Specifically, Ecology, when adopting a significant legislative rule, must:

> (a)  Clearly state in detail the general goals and specific objectives of the statute that the rule implements;
> (b)  Determine that the rule is needed to achieve the general goals and specific objectives stated under (a) of this subsection, and analyze alternatives to rule making and the consequences of not adopting the rule;
> (c)  Provide notification in the notice of proposed rule making under [Wash. Rev. Code] 34.05.320 that a preliminary cost-benefit analysis is available.  The preliminary cost-benefit analysis must fulfill the requirements of the cost-benefit analysis under (d) of this subsection.  If the agency files a supplemental notice under [Wash. Rev. Code] 34.05.340, the supplemental notice must include notification that a revised preliminary cost-benefit analysis is available.  A final cost-benefit analysis shall be available when the rule is adopted under [Wash. Rev. Code] 34.05.360;
> (d)  Determine that the probable benefits of the rule are greater than its probable costs, taking into account both the qualitative and quantitative benefits and costs and the specific directives of the statute being implemented;
> (e)  Determine, after considering alternative versions of the rule and the analysis required under (b), (c), and (d) of this subsection, that the rule being adopted is the least burdensome alternative for those required to comply with it that will achieve the general goals and specific objectives stated under (a) of this subsection;
> (f)  Determine that the rule does not require those to whom it applies to take an action that violates requirements of another federal or state law;
> (g)  Determine that the rule does not impose more stringent performance requirements on private entities than on public entities unless required to do so by federal or state law;

---

person to a penalty or sanction, that sets forth the agency's interpretation of statutory provisions it administers." Wash. Rev. Code 34.05.328(5)(c)(ii).

DEFENDANT AGENCIES' OPENING
BRIEF ON REMEDY PHASE
C11-417-MJP

10

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
(360) 586-6770

> (h) Determine if the rule differs from any federal regulation or statute applicable to the same activity or subject matter and, if so, determine that the difference is justified by the following:
>> (i) A state statute that explicitly allows the agency to differ from federal standards; or
>> (ii) Substantial evidence that the difference is necessary to achieve the general goals and specific objectives stated under (a) of this subsection; and
>> (i) Coordinate the rule, to the maximum extent practicable, with other federal, state, and local laws applicable to the same activity or subject matter.

Wash. Rev. Code 34.05.328(1).  Complete documentation of the rule's evaluation, analysis, supporting evidence, and determination must be included in Ecology's rulemaking file in sufficient quantity and quality to persuade a "reasonable person" that Ecology's determinations are justified.  Wash. Rev. Code 34.05.328(2).

Additionally, when adopting a significant legislative rule, Ecology must prepare a rule implementation plan for the rule file <u>before</u> the rule is adopted.  Wash. Rev. Code 34.05.328(3).  The rule implementation plan for a significant legislative rule must describe how Ecology intends to:

> (a) Implement and enforce the rule, including a description of the resources the agency intends to use;
> (b) Inform and educate affected persons about the rule;
> (c) Promote and assist voluntary compliance; and
> (d) Evaluate whether the rule achieves the purpose for which it was adopted, including, to the maximum extent practicable, the use of interim milestones to assess progress and the use of objectively measurable outcomes.

Wash. Rev. Code 34.05.328(3).

Ecology has adopted 18 significant legislative rules from 2008 through the present.  Declaration of Bari Schreiner in Support of Clean Air Agencies' Remedy Phase Opening Brief (Schreiner Decl.) ¶ C.  The average length of time that it takes for the rulemaking process from the filing of the pre-notice inquiry through final adoption of the rule is 2.3 years.  Schreiner Decl. ¶ D.  This average reflects complicated and/or controversial rulemakings which have taken between 2 and 5.5 years as well as less complicated and non-controversial rulemakings that can often be completed in less than a year.  Schreiner Decl. ¶¶ E–F.  To compare, Ecology is requesting a minimum of 19.5 months (about 1.67 years) to complete the RACT rulemaking

DEFENDANT AGENCIES' OPENING
BRIEF ON REMEDY PHASE
C11-417-MJP

11

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
(360) 586-6770

1   process after the initial information gathering process (estimated at 6.5 months) is completed—

2   for a total of 26 months.  Clark Decl. ¶ U.  As noted above, the formal rulemaking process will

3   begin after the Agencies complete a 6.5-month information collection process and then much

4   of the rulemaking process will proceed in tandem with the analytical work involved in making

5   the RACT determinations.  This is an ambitious timeline for a rule that is expected to be

6   complicated and controversial.  Schreiner Decl. ¶ G.

7   **III.    ARGUMENT**

8   In concluding that the Clean Air Agencies must determine RACT for emissions of

9   greenhouse gases from refineries, the Court determined that the RACT statute, Wash. Rev.

10  Code 70.94.154, is incorporated by reference into Washington's State Implementation Plan

11  (SIP).  Order on the Parties' Dispositive Motions (ECF No. 72) at 6.  The Agencies argued,

12  and continue to believe, that Wash. Rev. Code 70.94.154 is not incorporated by reference into

13  Washington's SIP.  The Agencies have further noted, and continue to believe, that the RACT

14  statute and regulation confer considerable discretion on the Agencies in implementing the

15  RACT process.  Indeed, the Agencies believe the only mandatory duty imposed by the RACT

16  provisions is the duty of Ecology to make a list and schedule for RACT determinations, and to

17  update it once every five years.  Wash. Rev. Code 70.94.154(4).[4]  The Agencies recognize,

18

---

19  [4] *See, e.g., Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 65, 124 S. Ct. 2373, 159 L. Ed. 2d

20  137 (2004) ("[W]hen an agency is compelled by law to act within a certain time period, but the manner of its action is left to the agency's discretion, a court can compel the agency to act, but has no power to specify what the action must be.").  When an administrative body has been found to have abused its discretion, a reviewing court's

21  proper course is ordinarily to remand the issue to the agency for reconsideration, rather than mandating that the discretion be exercised in a particular way.  *Nat'l Labor Relations Bd. v. Food Store Employees Union, Local 347*,

22  417 U.S. 1, 9–10, 94 S. Ct. 2074, 40 L. Ed. 2d 612 (1974).

23  This rule of law, that prohibits "undue judicial interference with [an agency's] lawful discretion," *Norton, supra* at 66, squarely has been applied in the context of the court's review of SIP provisions pursuant to 42 U.S.C.A. § 7604.  For example, courts may not enforce provisions in a SIP that are themselves discretionary

24  and may not "bootstrap" an enforceable commitment into a SIP.  *El Comité Para El Bienestar de Earlimart v. Warmerdam*, 539 F.3d 1062, 1069, 1073 (9th Cir. 2008).  Courts cannot fill gaps in a SIP or "modify" SIP

25  requirements to more effectively implement the goals of the SIP.  *Bayview Hunters Point Cmty. Advocates v. Metro Transp. Comm'n*, 366 F.3d 692, 698 (9th Cir. 2004).

26  Indeed, the United States Supreme Court recently articulated similar principles when it declined to apply federal nuisance law to the regulation of greenhouse gases from power plants:

---

DEFENDANT AGENCIES' OPENING
BRIEF ON REMEDY PHASE
C11-417-MJP

12

1  however, that for the purposes of the remedy phase of this case, we must follow the Court's

2  directive and propose a schedule for making the RACT determinations for the refineries.

3  **A.      RACT Requires A Balancing Process**

4          A RACT determination requires the regulating agency to "use its best professional

5  judgment, considering all the information available to it" to "balance the need for cleaner air

6  (including minimizing adverse health impacts) against the capital and operating costs of

7  additional technologies for controlling emissions." *Bowers v. Pollution Control Hearings Bd.*,

8  13 P.3d 1076, 1091 (Wash. Ct. App. 2000). The RACT statute does not state that one factor is

9  more important than any other or state how the factors are to be weighted. *Id.* at 1092.

10  However, it is appropriate to consider potential economic and social impacts as "other relevant

11  factors" in setting RACT, including the impact on the regional economy from a proposed

12  RACT limit that could result in closure of a facility. *Id.* at 1091.

13  **B.      RACT Determinations Must Include All Contaminants Of Concern**

14          When RACT is determined, all contaminants of concern, where practicable, must be

15  addressed. Wash. Rev. Code 70.94.154(5). *See also Bowers*, 13 P.3d at 1097 (approving a

16  RACT process in which the regulating agency, while not addressing all contaminants emitted

17  by a source, explained how it considered which contaminants were "of concern" and which

18  were "practicable to address").

19          In this case, the Court has determined that greenhouse gases are contaminants of

20  concern for refineries.[5] It is now up to the Clean Air Agencies to determine whether or not

21  _____

22          The appropriate amount of regulation in any particular greenhouse gas-producing sector cannot be prescribed in a vacuum . . . . The Clean Air Act entrusts such complex balancing to EPA in the first instance, in combination with state regulators. . . . The expert agency is surely better equipped to do the job than individual district judges issuing ad hoc, case-by-case injunctions. Federal judges lack the scientific, economic, and technological resources an agency can utilize in coping with issues of this order.

23

24  *American Electric Power Co., Inc. v. Connecticut*, 131 S. Ct. 2527, 2539–40, 180 L. E. 2d 435 (2011).

25          [5] The Clean Air Agencies recognize that the refineries are significant sources of greenhouse gases, but they have not made a determination that those emissions are "of concern" within the meaning of Wash. Rev.

26  Code 70.94.154(5). The Court's ruling has effectively precluded the Agencies from exercising its discretion on this issue.

1   there are additional contaminants of concern that must also be addressed in this RACT process.

2   In making that determination, the Agencies may consider the quantities of pollutants emitted,

3   how the quantities compare against screening criteria, relevant ambient air quality standards,

4   past violations of emissions limits, potential visibility impacts, and studies of health concerns

5   associated with the pollutants.  *Bowers*, 13 P.3d at 1097.  In considering the "practicability" of

6   setting emission limits, the Agencies may evaluate the availability of additional controls, how

7   other sources have controlled the pollutants, and impending federal standards for the source

8   category.  *Id.*  Finally, the Agencies may consider their own internal resources and the potential

9   for delay in issuing the final RACT determination if a RACT review is required for every

10  pollutant emitted.  *Id.*

11  **C.    The Agencies Need A Minimum Of 26 Months To Complete All Of The Tasks
    Associated With RACT Determinations For The Refineries**

12

13          As explained above in the Statement of Facts and in the Clark and Asmundson

14  declarations, the RACT rulemaking process will require an initial period of information

15  gathering, after which substantive analysis can proceed in parallel with a stakeholder process,

16  resulting in preliminary RACT determinations that will form the basis for a proposed

17  state-wide rule.  Once a proposed rule has been published, there are a series of statutory

18  requirements that must be met before a final rule may be adopted.

19          The Clean Air Agencies estimate that it will take 6.5 months to complete the initial

20  stages, to a point where they can initiate the formal rulemaking process and the Agencies' own

21  substantive analysis of what constitutes RACT.  The analytical work leading up to and

22  resulting in preliminary RACT determinations will then take about 14.5 months and this will

23  occur simultaneously with the rulemaking stakeholder process.  After the analytical work and

24  the stakeholder process concludes, Ecology can file a notice of proposed rules that incorporate

25  the RACT determinations, and will take a minimum of 5 months for the remainder of the

26  rulemaking process.  This 26-month schedule is aggressive, and assumes no real difficulty in

DEFENDANT AGENCIES' OPENING
BRIEF ON REMEDY PHASE
C11-417-MJP

14

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
(360) 586-6770

1  either the substantive analysis conducted by the Agencies or unforeseen bumps in the

2  rulemaking road.

3       Anything less than the schedule proposed here will undermine the Agencies' efforts to

4  do a thorough and deliberative job and will increase the likelihood that the rule will be

5  invalidated if challenged.  The schedule being proposed is consistent with the time that it took

6  to do a prior RACT determination on another complex source (i.e., the Centralia Power Plant)

7  and with Ecology's typical schedule for complicated, technical, and controversial rulemakings.

8                    **IV.   CONCLUSION**

9       For the reasons stated above, the Clean Air Agencies respectfully ask the Court to give

10  the Agencies a minimum of 26 months to complete the RACT process required by the Court's

11  Order on the Parties' Dispositive Motions.

12       DATED this 6th day of February 2012.

13  ROBERT M. McKENNA                      MARTEN LAW PLLC
    Attorney General
14
    *s/ Laura J. Watson*                     *s/ Svend A. Brandt-Erichsen*
15  KATHARINE G. SHIREY, WSBA #35736        SVEND A. BRANDT-ERICHSEN
    LAURA J. WATSON, WSBA #28452            WSBA #23923
16  Assistant Attorneys General             *Attorney for Defendant Mark Asmundson*
    *Attorneys for Defendant Ted Sturdevant*  1191 Second Avenue, Suite 2200
17  P.O. Box 40117                          Seattle, WA  98101
    Olympia, WA 98504-0117                  svendbe@martenlaw.com
18  kays1@atg.wa.gov; lauraw2@atg.wa.gov    (206) 292-2600
    (360) 586-6770
19
    PUGET SOUND CLEAN AIR AGENCY
20
    *s/ Jennifer A. Dold*
21  JENNIFER A. DOLD, WSBA #23822
    *Attorney for Defendant Craig Kenworthy*
22  1904 3rd Avenue, Suite 105
    Seattle, WA 98101-3317
23  jenniferd@pscleanair.org
    (206) 343-8800
24

25

26

DEFENDANT AGENCIES' OPENING              15          ATTORNEY GENERAL OF WASHINGTON
BRIEF ON REMEDY PHASE                                        Ecology Division
C11-417-MJP                                                   PO Box 40117
                                                          Olympia, WA 98504-0117
                                                              (360) 586-6770

1

## PROOF OF SERVICE

2      I hereby certify that on February 6, 2012, a copy of the foregoing document was

3 electronically filed with the Clerk of Court using the CMF/ECF system, which will send

4 notification of such filing to the following:

5
6      • **Svend A Brandt-Erichsen**
         svendbe@martenlaw.com, eherlihy@martenlaw.com
7      • **Janette K. Brimmer**
         jbrimmer@earthjustice.org, cmcevoy@earthjustice.org, kregan@earthjustice.org,
8        chamborg@earthjustice.org
       • **Brian W Chestnut**
9        bchestnut@zcvbs.com, bgruber@zcvbs.com, hreynolds@zcvbs.com
       • **Jennifer A Dold**
10       jenniferd@pscleanair.org
       • **Steven D Keeler**
11       co2truths@gmail.com
       • **Jeffrey Wayne Leppo**
12       jwleppo@stoel.com, SEA_Docket@stoel.com, jashore@stoel.com
       • **Joshua Osborne-Klein**
13       joshok@zcvbs.com, ckelsey@zcvbs.com, mvoege@zcvbs.com
       • **Katharine G. Shirey**
14       ecyolyef@atg.wa.gov, kays1@atg.wa.gov, DanielleF@atg.wa.gov
       • **Ryan P. Steen**
15       rpsteen@stoel.com, SEA_DOCKET@stoel.com, lastevens@stoel.com,
         sdloomis@stoel.com
16     • **Laura J Watson**
         lauraw2@atg.wa.gov, ecyolyef@atg.wa.gov
17

18     DATED this 6th day of February 2012.
19

20                                    _s/ Laura J. Watson_
                                      LAURA J. WATSON, WSBA #28452
21                                    Assistant Attorney General

22

23

24

25

26