1

2

3

4

5

6
                                              The Honorable Marsha J. Pechman

7                    **UNITED STATES DISTRICT COURT**
                    **WESTERN DISTRICT OF WASHINGTON**
8                              **AT SEATTLE**

9    WASHINGTON ENVIRONMENTAL                Case No.  2:11-cv-00417-MJP
     COUNCIL and SIERRA CLUB
10   WASHINGTON STATE CHAPTER,
                                             DEFENDANT AGENCIES'
11                      Plaintiffs,          REPLY BRIEF ON REMEDY
                                             PHASE
12          v.

13   THEODORE ("TED") L.
     STURDEVANT, DIRECTOR,
14   WASHINGTON STATE
     DEPARTMENT OF ECOLOGY, in his
15   official capacity, MARK ASMUNDSON,
     DIRECTOR, NORTHWEST CLEAN
16   AIR AGENCY, in his official capacity,
     and CRAIG T. KENWORTHY,
17   DIRECTOR, PUGET SOUND CLEAN
     AIR AGENCY, in his official capacity,
18
                        Defendants,
19
            and
20
     WESTERN STATES PETROLEUM
21   ASSOCIATION,

22                      Intervenor-Defendant.

23

24

25

26

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
(360) 586-6770

1

## I.    INTRODUCTION

2      The Clean Air Agencies have offered the Court a thoughtful, detailed 26-month schedule

3   to conduct state-wide rule-making to implement the Court's December 1, 2011, order.  The

4   schedule is based upon the mandatory elements of state law that address both the applicable

5   elements of the Reasonably Available Control Technologies (RACT) statutory provisions

6   and Washington's Administrative Procedure Act (APA).  The Agencies' proposal contains

7   efficient and reasonable timeframes for meeting all requirements.

8      In contrast, the Plaintiffs' proposed 167-day (about five and one half months)

9   schedule skips altogether or minimizes many required elements the Agencies must meet to

10  adopt RACT determinations as ordered by this Court.  Plaintiffs also rely upon a declaration

11  riddled with errors and statements that lack foundation and credibility.  The Court should

12  reject Plaintiffs' unrealistic and unreasonable proposal and adopt the Agencies' proposed

13  order and schedule.

## II.    ARGUMENT

14

15  **A.    Plaintiffs' 90 Day Schedule For Completing RACT Determinations Is Unrealistic
        And Ignores Mandatory Components Of The RACT Analysis**

16

17      The Plaintiffs advocate for a 90 day schedule to complete the entire technical analysis

18  that underlies the RACT determinations.  Plaintiffs' Br. (ECF No. 81) at 6.  In advocating for

19  this schedule, the Plaintiffs ignore or minimize every one of the mandatory RACT factors

20  identified in the Washington Clean Air Act and ignore other statutory RACT requirements.

21  The Plaintiffs' proposal is unrealistic and should be rejected.

22      There are five RACT factors that the Clean Air Agencies must analyze in order to

23  determine RACT for the refineries: (1) the impact of the source upon air quality; (2) the

24  availability of additional controls; (3) the emission reduction to be achieved by the additional

25  controls; (4) the impact of additional controls on air quality; and (5) the capital and operating

26  costs of the additional controls.  Wash. Rev. Code § 70.94.154(5) (citing Wash. Rev. Code

DEFENDANT AGENCIES' REPLY BRIEF
ON REMEDY PHASE

2

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
(360) 586-6770

§ 70.94.030(20)).  In addition, "[i]n establishing or revising RACT requirements, ecology and local authorities shall address, where practicable, all air contaminants deemed to be of concern for that source or source category."  Wash. Rev. Code § 70.94.154(5).  It is these requirements that Plaintiffs ignore when they put forward their unworkable schedule.

      **1.**      **Plaintiffs ignore the requirement that the Agencies address all contaminants of concern in the RACT process.**

The first major error reflected in the Plaintiffs' proposed schedule is that they ignore the requirement that the Clean Air Agencies address all air contaminants deemed to be of concern when establishing RACT.  Wash. Rev. Code § 70.94.154(5).  The Court recognized this requirement in ordering that the Agencies establish RACT requirements for all contaminants deemed to be of concern, including greenhouse gases.  Order Denying Intervenor-Defendant's Motion for Reconsideration (ECF No. 77) at 2 ("In accordance with the procedures set forth in Wash. Rev. Code § 70.94.154, the Court ordered the Agencies to establish RACTs that address 'all air contaminants' deemed to be of concern for that source or source category, including greenhouse gases.")  Determining which air contaminants are deemed to be of concern rests within the Agencies' discretion.  *See Bowers v. Pollution Control Hearings Bd.*, 103 Wash. App. 587, 13 P.3d 1076, 1097-1098 (2000) (upholding local air agency's discretionary decision to choose which pollutants to address in its RACT analysis).

While Plaintiffs present their case as solely focused upon greenhouse gas emissions, the Agencies cannot share the same limited perspective and still fulfill the requirements of Wash. Rev. Code § 70.94.154(5).  Based upon the Agencies' knowledge of the five refineries located within their jurisdictions, the Agencies expect that there could be contaminants in addition to greenhouse gases that they deem are of concern and should be addressed through the RACT process.  Declaration of Mark Asmundson (Asmundson Decl.) (ECF No. 84) ¶¶ 13-16.  The schedule for RACT determinations, as ordered by the Court, must reasonably

DEFENDANT AGENCIES' REPLY BRIEF
ON REMEDY PHASE

3

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
(360) 586-6770

1    take into account the need to identify these additional contaminants, as well as the

2    requirement to employ all of the RACT factors for each contaminant deemed to be of

3    concern.  The Plaintiffs' proposed schedule omits this requirement altogether.

4         The Clean Air Agencies anticipate that the Plaintiffs may argue that the Agencies can

5    do RACT for greenhouse gases first and then go back at some later time to do RACT for

6    other air contaminants deemed to be of concern.  However, this argument ignores the express

7    statutory language requiring the Agencies to look at all contaminants of concern "when

8    establishing RACT requirements."    It also impermissibly trounces on the Agencies'

9    discretion to determine which contaminants are of concern and to address them accordingly.

10        Additionally, addressing one pollutant in a vacuum and then later addressing other

11   pollutants is not feasible from an engineering perspective.  As recognized by the Agencies

12   and the Environmental Protection Agency (EPA), decreases in greenhouse gas emissions can

13   result in concomitant increases in emissions of other pollutants.  Asmundson Decl. (ECF

14   No. 84) ¶ 44; Declaration of Mark Buford (Buford Decl.) ¶ 10, and Ex. B (EPA Report at 12-

15   13).  If the Agencies impose controls on greenhouse gases without any regard for those

16   controls' impacts on other pollutants, the Agencies may later need to undo some of the

17   greenhouse gas controls in order to decrease emissions of other pollutants, effectively having

18   to re-do portion of its greenhouse gas analysis as part of its RACT analysis for other

19   pollutants.  Buford Decl. ¶ 11.  That is an unreasonable and inefficient way to determine

20   RACT and is contrary to the statutory mandate that an agency address all contaminants of

21   concern at the time that it is establishing RACT requirements.

22        **2.    Plaintiffs ignore the requirement that the Agencies analyze air quality
          impacts both before and after the imposition of controls.**

23        The fact that reductions of greenhouse gas emissions can affect the emissions of other

24   pollutants also helps illustrate the need to thoroughly analyze the two RACT factors

25   identified in Wash. Rev. Code § 70.94.030(20):  (1) an assessment of a source's current

26

1   impact to air quality; and (2) the impact after installation of additional controls, which

2   includes consideration of possible health impacts.  Asmundson Decl. (ECF No. 84) 40-44.

3   This part of the RACT analysis entails a hard look at air quality impacts, including the need

4   to minimize health impacts.  *Bowers*, 13 P.3d at 1091.

5       Plaintiffs gloss over these two RACT factors by omitting this requirement from their

6   proposed RACT schedule.  In doing so, they rely on Dr. Sahu's blithe conclusion that

7   impacts to air quality need not be considered in the analysis because "the impact of [energy

8   efficiency measures] on air quality is generally positive."  Declaration of Ranajit Sahu (Sahu

9   Decl.) (ECF No. 82) ¶ 25.  Contrary to Dr. Sahu's dismissal of these RACT factors, a

10  thorough air quality impacts analysis is not only required but is also important to the vast

11  majority of the public who deserve to know how regulatory measures will impact their health

12  and well being.  Dr. Sahu, lacking any regulatory experience, ignores the Agencies'

13  responsibility to the public at large and is ill-equipped to define what it takes to develop a

14  defensible RACT determination.  Declaration of Alan Newman (Newman Decl.) ¶¶ 5-6.

15      In fact, the adequacy of the air quality impacts analysis was a key issue addressed in

16  the legal challenge of a RACT determination issued by a local air agency for the Centralia

17  Power Plant in the 1990s.  *See Bowers*, 13 P.3d at 1084-1091.  In that case, the agency

18  conducted air impacts modeling and hired an epidemiologist from Johns Hopkins' University

19  to do a health risk assessment, which was then peer reviewed by numerous and diverse

20  experts.  *Id.* at 1085-1087, 1088-1091.  Despite the agency's extensive analysis, this aspect of

21  the analysis was still challenged by the plaintiff as being insufficient.  However, the state

22  Court of Appeals upheld this aspect of the agency's RACT analysis (discussing it at length in

23  its decision).  *Id.* at 1084-1091.  The Plaintiffs' contention here that air quality impacts need

24  not be analyzed in any depth as part of a RACT determination is without merit.

25

26

3.   **Plaintiffs ignore the requirement that the Agencies consider capital and operating costs of RACT controls.**

Dr. Sahu and the Plaintiffs also ignore the RACT factor requiring consideration of "capital and operating costs of the additional controls."  Wash. Rev. Code § 70.94.030(20); *Bowers*, 13 P.3d at 1091 (agency must use best professional judgment and "balance the need for cleaner air (including minimizing adverse health impacts) against the capital and operating costs of additional technologies[.]")

Dr. Sahu dismisses the cost factor by stating "the references I have provided also provide general ideas of cost."  Sahu Decl. (ECF No. 82) ¶ 25.  Actually, the references Dr. Sahu cites do not provide information about the capital and operating costs of the various technologies except for one experimental technology for the cement industry.  Buford Decl. ¶ 13.  Moreover, the limited economic information provided by some of the documents is generalized across industries and is of little to no value in a RACT analysis.  Buford Decl. ¶¶ 13-14.  The Agencies do not know of any readily available source of cost information and will therefore have to gather it from various sources, including the refineries themselves. Buford Decl. ¶ 13.

Even if existing resources did provide meaningful cost data, this would not substitute for the Agencies' need to do cost effectiveness determinations for the five specific refineries subject to RACT in Washington.  Indeed, all three reports that Dr. Sahu cites demonstrate the need to consider source-specific costs due to the complexity of refineries and the significant variations across refineries.  *See* Newman Decl. ¶ 7 (citing Energy Star Report at 25 ("Every refinery and plant will be different.  The most favorable selection of energy efficiency opportunities should be made on a plant-specific basis.")); Buford Decl., Ex. B at 20 ("specific energy savings and payback periods are highly facility-specific"); Newman Decl. ¶¶ 6-7 (citing DOE Bandwidth Report at 33 (discussing complex arrangements of process

DEFENDANT AGENCIES' REPLY BRIEF
ON REMEDY PHASE

6

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
(360) 586-6770

1    units within refineries and how those process units may interact depending on various

2    factors)).[1]

3    **4.    Plaintiffs ignore the remaining two RACT factors that require consideration of additional controls and emission reductions to be achieved by those controls.**

4

5    Next, the Plaintiffs and Dr. Sahu ignore the RACT factors that require the Agencies

6    to determine "the availability of additional controls [for the sources and] the emission

7    reduction to be achieved by additional controls." Wash. Rev. Code § 70.94.030(5). It is

8    axiomatic that the Agencies must first determine which controls are in place before

9    determining what additional controls are needed and the emissions reductions that can be

10   achieved through those additional controls. However, Dr. Sahu dismisses these factors by

11   stating that the "'availability of additional controls' is addressed in the EPA document as

12   well as in work by California Air Resources Board (CARB) since these documents discuss

13   multiple approaches that can be deployed to reduce greenhouse gas emissions." Sahu

14   Decl. (ECF No. 82) ¶ 25. Dr. Sahu's theory of RACT appears to be that the Agencies can

15   take an existing report and plop the measures in the report onto Washington's five refineries

16   for a slapdash but passable RACT determination. However, the reports identified by

17   Dr. Sahu do not provide the level of specificity needed for the RACT analysis. Buford Decl.

18   ¶ 16. RACT determinations necessarily require in-depth consideration of the specific sources

19

20

21       [1] Dr. Sahu also cites a short 2008 PowerPoint presentation by the California Air Resources Board
22   (CARB) for the unfounded conclusion that Washington does not need to look at specific sources in determining
     RACT. Sahu Decl. (ECF No. 82) ¶ 24b ("I note that staff at CARB did not attempt to address each specific
23   refinery . . . These are the same approaches that will be applicable at the Washington refineries.") Dr. Sahu's
     reliance on the PowerPoint presentation is misplaced because he erroneously treats the information in the
     presentation as if it provides a final decision from CARB instead of the preliminary ideas that it represents.
24   Declaration of CARB Employee Michael Waugh ¶ 6. In fact, CARB never implemented the ideas in the
     PowerPoint presentation nor does CARB have plans to implement them. *Id.* One reason that CARB chose not to
25   implement them is that CARB recognized the exceptional complexity of the refineries and concluded that it was
     not feasible to apply across-the-board measures to them. *Id.* ¶ 7. As a result, CARB decided to address refinery
26   emissions almost exclusively through California's cap-and-trade program instead of embarking on the alternative
     regulatory route that was being contemplated in September of 2008. *Id.* ¶ 8.

1    being regulated, a point that is also bolstered by the reports that the Plaintiffs rely on.[2]

2    Newman Decl. ¶¶ 6-7.

3          Dr. Sahu also underestimates the number of process units that need to be considered

4    in the RACT process by identifying only process heaters, boilers, and flares.  Sahu Decl.

5    (ECF No. 82) ¶ 17.  Dr. Sahu omits numerous other units, including the fluid catalytic

6    cracking unit which is often the single largest source of greenhouse gas emissions at a

7    refinery.  Buford Decl. ¶ 7.

8          A basic flowchart of refinery processes is attached to the Declaration of Mark Buford.

9    Buford Decl. Ex. A.  As the chart shows, petroleum refineries consist of numerous units that

10   perform complex networks of interwoven and interconnected processes that rely on rapid

11   heating of highly flammable liquids (crude oil and its constituent components) to separate

12   them into separate fractions (such as propane and gasoline), followed immediately by rapid

13   cooling to turn the separated fractions back to liquids for further purification and processing.

14   The system requires a regime of varying temperatures and pressures that must be constantly

15   balanced to avoid the devastating explosions and fires that can occur when the balance is

16   upset.   Adding emission controls and even energy efficiency measures under such

17   circumstances is a complex process.  Newman Decl. ¶ 8.

18         Furthermore, no two refineries are alike.  This creates the need for individualized

19   consideration of a refinery's unique process units in order to analyze RACT factors related to

20   existing controls, feasible future controls, and cost-effectiveness of those controls. One

21   example is that different refineries are designed to be able to handle different types of crude

22   oil, and the processes employed by the refineries vary depending on the type of crude they

23          [2] Furthermore, EPA acknowledges upfront that its report is not a comprehensive compendium of all
24   existing controls that might apply to greenhouse gases: "[T]his paper does not necessarily represent all potentially
     available technologies or measures that may be considered for any given source for the purpose of reducing its
25   GHG emissions . . . The information presented in this document does not represent U.S. EPA endorsement of any
     particular control strategy.  As such, it should not be construed as approval of a particular control technology or
26   measure, or of the emissions reductions that could be achieved by a particular unit or source under review."
     Buford Decl. Ex. B at 1.

1    process.  Newman Decl. ¶ 9.  A second example is that some refineries have hydrogen plants

2    which are energy intensive whereas other refineries do not.  *Id.*  And there are numerous

3    other examples of the differences between refineries, necessitating an individualized

4    assessment before RACT controls are determined.  *Id.*

5         In addition, each refinery in Washington was built at a different time with a different

6    initial design to maximize its ability to process the chosen grade of crude oil and produce the

7    chosen product mix.  Over time all of Washington's refineries have undergone additions and

8    improvements to embody new technology or expand the number and types of processes the

9    refinery can conduct.  These changes have been squeezed into the initial footprint of the

10   facility and often serve to physically limit the space available for changes.  For example, it

11   took one refinery in Washington five years to come up with a design that would enable it to

12   add low nitrogen oxide burners in the space available on a boiler.  Newman Decl. ¶ 10.

13        Thus, while it is possible to look at refinery processes in general and identify possible

14   avenues for reducing emissions, it is another matter altogether to look at implementing those

15   ideas within a specific refinery.  The Plaintiffs' failure to recognize this results in their

16   overlooking these two RACT factors.

17        **5.    Plaintiffs' erroneous conflation of energy efficiency measures with**
          **greenhouse gas reduction measures further undermines their proposed**
18        **schedule.**

19        Last, the Plaintiffs present this Court with a fundamentally flawed underlying premise

20   as a basis for their unrealistic schedule-- that to implement RACT the Clean Air Agencies do

21   little more than mandate across-the-board energy efficiency measures.  *See, e.g.,* Plaintiffs

22   Br. (ECF No. 81) at 5-6 ("Because significant research regarding *energy efficiency* processes

23   at Oil Refineries already exists, is readily available to the Agencies, and can be generally

24   applied to many of the Oil Refineries' processes across different refineries, the Agencies

25   should be able to develop these RACT proposals in no more than 90 days); *id.* at 7 (admitting

26   that Dr. Sahu only looked at efficiency measures at refineries).  However, energy efficiency

1  measures are just one sub-set of the four options that the Agencies will consider to address

2  greenhouse gas reductions. They will also look at options for other types of process changes,

3  facility redesign, experimental technologies, and add-on pollution control devices.

4  Asmundson Decl. (ECF No. 84) ¶ 32.  As EPA and the Agencies recognize, good energy

5  management alone does not guarantee greenhouse gas reductions but must be considered

6  along with other measures.  Buford Decl. ¶ 15, Ex. B at 18.

7       The Plaintiffs' flawed premise allows them to boil the entire RACT process down to a

8  single component of the RACT analysis.  In essence, Plaintiffs argue through Dr. Sahu that

9  the only responsibility the Agencies have is to compile existing studies describing potential

10  energy efficiency measures at refineries (putting aside the fact that the generalized

11  conclusions in these studies do not readily translate into emission limits for specific emission

12  units).[3]  Sahu Decl. (ECF No. 82) ¶¶ 24-25.  However, this is just one of many tasks that the

13  Agencies need to complete in order to determine RACT for the refineries.   Plaintiffs'

14  disregard of the numerous other tasks associated with RACT renders their proposed schedule

15  unworkable.

16       The Plaintiffs' unrealistic schedule ignores multiple RACT factors and disregards the

17  technical analytical work associated with doing RACT determinations.   Bypassing those

18  required steps, which are necessary to a deliberate and defensible regulatory action, might

19  appear to produce a faster final decision.   However, that appearance is deceiving.   If a

20  reviewing court strikes down hasty RACT determinations, the Agencies will have to begin

21  the process from scratch thereby adding considerable delay to the amount of time needed to

22  get to a solid and defensible RACT decision.   Declaration of Stuart Clark (Clark Decl.

23

24

25  [3] The Agencies agree that compilation and review of existing resources is a component of the RACT
    analysis, and they identified it as sub-task 2a in their detailed task list.  Asmundson Decl. ¶¶ 33-36. The Agencies
26  also agree that this task will take about 90 days (13 weeks) as Dr. Sahu himself predicts.  However, this one task
    cannot be focused on in isolation to create an unreasonable, truncated schedule.

DEFENDANT AGENCIES' REPLY BRIEF                           10                    ATTORNEY GENERAL OF WASHINGTON
ON REMEDY PHASE                                                                            Ecology Division
                                                                                           PO Box 40117
                                                                                      Olympia, WA 98504-0117
                                                                                         (360) 586-6770

1    (ECF No. 86) ¶ U.  The Court should avoid that result and give the Agencies the time they

2    need to make solid and defensible RACT determinations the first time around.

3    **B.    Plaintiffs' Five Month Schedule To Conduct Formal Rulemaking Is Unrealistic And Ignores Mandatory Requirements Of The State Administrative Procedure Act**

4

5            In addition to shortchanging the amount of time needed to do a RACT analysis, the

6    Plaintiffs also significantly underestimate the time needed to complete a formal rulemaking.

7    As noted in the Clean Air Agencies' opening materials, the average length of time it takes to

8    promulgate a significant legislative rule is 2.3 years.  Declaration of Bari Schreiner

9    (Schreiner Decl.) (ECF No. 87) ¶ D.  Here, the Agencies propose a shorter 1.67 year

10   rulemaking process to begin after a 6.5 month period of information collection—for a total of

11   26 months.  The Plaintiffs' proposal of scarcely more than five months provides less time

12   than it takes for promulgation of even the simplest rules.  *Id.* ¶ F. And RACT determinations

13   are not simple rules.  They will be technical, complicated, and probably controversial.  The

14   Plaintiffs' proposed five month schedule is grossly inadequate and ignores key mandates of

15   the state APA.

16          **1.    Courts give considerable deference to an agency's estimate of how long it will take to conduct rulemaking.**

17

18          "Absent a precise statutory timetable or other factors counseling expeditious action,

19   an agency's control over the timetable of a rulemaking proceeding is entitled to considerable

20   deference."  *Sierra Club v. Gorsuch*, 715 F.2d 653, 658 (D.C. Cir. 1983) (footnotes omitted).

21   Along these lines, courts have been reluctant to second guess an agency's proposed timetable

22   for a complex and technical rule.  For example, in *In re United Steelworkers v. Rubber Mfrs.*

23   *Ass'n,* 783 F.2d 1117 (D.C. Cir. 1986), the D.C. Circuit Court of Appeals declined to

24   determine in advance that the Occupational Safety and Health Agency's (OSHA) proposed

25   schedule for adopting worker safety rules for benzene was "unreasonable" and rejected a

26   more expedited proposal by plaintiffs.  The court reasoned that OSHA was faced with

DEFENDANT AGENCIES' REPLY BRIEF
ON REMEDY PHASE

11

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
(360) 586-6770

1   "complex scientific and technical issues" and that "judicial imposition of an overly hasty

2   timetable at this stage would ill serve the public interest.  The rule ultimately promulgated by

3   the agency, not to mention the agency's rationale for the rule, must be constructed carefully

4   and thoroughly if the agency's action is to pass judicial scrutiny this time around."  *Id.* at

5   1120.

6        The court reached a similar conclusion when considering whether EPA had

7   unreasonably delayed in promulgating a rule under the Clean Air Act to determine whether

8   strip mines should be subject to fugitive emissions regulation.  *Sierra Club v. Thomas*, 828

9   F.2d 783 (D.C. Cir. 1987).  There, the court commented on the inherent complexity of any

10  rule under the Clean Air Act and emphasized the importance of giving EPA enough time to

11  get the rule right:

12        A simple reading of the Clean Air Act reveals that whether to impose a certain
          type of regulation involves complex scientific, technological, and policy
13        questions.  EPA must be afforded the amount of time necessary to analyze
          such questions so that it can reach considered results in a final rulemaking that
14        will not be arbitrary and capricious or an abuse of discretion. Indeed, by
          decreasing the risk of later judicial invalidation and remand to the agency,
15        additional time spent reviewing a rulemaking proposal before it is adopted
          may well ensure earlier, not later, implementation of any eventual regulatory
16        scheme. Given the complexity of the issues facing EPA and the highly
          controversial nature of the proposal, agency deliberation for less than three
17        years—little more than one year since the close of the public comment
          period—can hardly be considered unreasonable.

18  *Id.* at 798-99; *see also Oil, Chemical & Atomic Workers Int'l Union v. Zegeer*, 768 F.2d

19  1480, 1488 (D.C. Cir. 1985) (court upheld agency's judgment in establishing necessary

20  stages and timeframes for rulemaking for rules involving "complex scientific and technical

21  issues.")

22        The Court should apply the appropriate level of deference and adopt the Agencies'

23  proposal which is based on a thorough and detailed time estimate of the tasks associated with

24  making RACT determinations.  In contrast, the Plaintiffs have not even attempted to develop

25

26

DEFENDANT AGENCIES' REPLY BRIEF                    12                    ATTORNEY GENERAL OF WASHINGTON
ON REMEDY PHASE                                                              Ecology Division
                                                                            PO Box 40117
                                                                        Olympia, WA 98504-0117
                                                                           (360) 586-6770

1    a realistic schedule that would allow the Agencies to do their analytical work and meet all of

2    the statutory rulemaking requirements.  Therefore, the Plaintiffs' proposal should be rejected.

3        **2.     Plaintiffs' proposal disregards the statutory requirements for significant
                 legislative rulemaking.**

4

5        The Plaintiffs accomplish their five and a half month proposal by ignoring the

     significant legislative rulemaking requirements in Wash. Rev. Code § 34.05.328.  As noted in
6
     the Agencies' opening brief, there are extensive mandatory requirements that must be met
7
     before a rule can be promulgated.[4]  Agencies' Opening Br. (ECF No. 83) at 9-11.  Failure to
8
     follow these requirements is grounds for invalidation of the rule.  Wash. Rev. Code
9
     § 34.05.570(2)(c) (court shall invalidate rule if "the rule was adopted without compliance
10
     with statutory rule-making procedures.")
11
         The Plaintiffs make no mention of the numerous significant legislative rulemaking
12
     requirements other than to lightly dismiss the requirement to do a cost-benefit analysis by
13
     erroneously stating that such an analysis would "be duplicative of the RACT analysis."
14
     Plaintiffs' Br. (ECF No. 81) at 8.  In fact, the statutorily required cost benefit analysis is not
15
     duplicative of the cost-effectiveness analysis that is done for RACT.  The cost-effectiveness
16
     analysis looks at the specific capital and operational costs of the specific sources being
17
     regulated.  Asmundson Decl. (ECF No. 84) ¶¶ 37, 40.  In contrast, the cost benefit analysis
18
     looks broadly at the overall economic impacts of the rule and requires Ecology to make an
19
     affirmative determination that the probable benefits of the rule will exceed its probable costs.
20
     Wash. Rev. Code § 34.05.328(1)(d).  However, even if these economic analyses did overlap
21

22

23        [4] Also, the State Legislature appears poised to pass a bill that will add additional requirements to
     Ecology's rulemaking process.  On February 9, 2012, the State House of Representatives unanimously passed
24   Engrossed Substitute House Bill (ESHB) 2335 which requires Ecology to identify and index sources of
     information relied upon when taking "significant agency action" which is defined to include development of
25   significant legislative rules.  All records relied on by Ecology must be made available before any public comment
     period begins.    *See* ESHB 2335 § 2, *available at* http://apps.leg.wa.gov/documents/billdocs/2011-
26   12/Pdf/Bills/House%20Bills/2335-S.E.pdf .

DEFENDANT AGENCIES' REPLY BRIEF                    13
ON REMEDY PHASE

1    to some extent, the cost benefit analysis is just one of the many mandatory requirements

2    associated with significant legislative rulemaking.[5]

3          The Plaintiffs' proposal appears to be based on the bare minimum timelines in the

4    APA, but does not provide any information on how long a formal significant legislative

5    rulemaking actually takes (which is a little over two years on average).  For example, the

6    Plaintiffs make the unfounded assertion that the Agencies should be able to "complete the

7    [concise] explanatory statement within 30-days of the close of the comment period."

8    Plaintiffs' Br. (ECF No. 81) at 9.  Among other things, the concise explanatory statement

9    serves the important function of summarizing and responding to written comments.  Wash.

10   Rev. Code § 34.05.325(6).  As was the situation with the benzene standard in the *United

11   Steelworkers* case, Ecology "must, of necessity, deal with a host of complex scientific and

12   technical issues.  [The agency] obviously cannot know at present how many comments it will

13   receive or the nature of those comments."  *United Steelworkers*, 783 F.2d at 1120.  Because

14   of the importance of getting it right, the D.C. Circuit refused to "punish" OSHA for past

15   delay by imposing a mandatory, accelerated rulemaking timetable.  *Id.*  Likewise, Ecology

16   needs sufficient time to meet its statutory rulemaking obligations to help ensure a

17   procedurally and substantively defensible rule at the end of the process.

18          **3.      Ecology cannot file a pre-rulemaking statement of inquiry until the
                      Agencies have completed their information collection.**
19
20          The Plaintiffs also argue that Ecology should be required to file a pre-rulemaking

21   statement of inquiry within 14 days of the Court's order.  Plaintiffs' Br. (ECF No. 81) 4-5.

22   However, Ecology cannot issue its pre-notice inquiry until it actually knows what topics its

---

23          [5] The Plaintiffs also argue that a small business economic impact statement is not required because the
24   rulemaking is being conducted "solely for the purpose of conformity or compliance . . . with federal statute or
     regulations."  Plaintiffs'. Br. (ECF No. 81) at 8 (citing Wash. Rev. Code § 19.85.061).  Ecology disagrees.  The
25   small business economic impact statement is typically required if the proposed rule is expected to impose more
     than minor costs on an industry, not just small businesses within that industry.   Wash. Rev. Code
     § 19.85.030(1)(a)(i).  At any rate, the small business economic impact statement is not an independent driver of
26   the schedule being proposed by the Agencies because Ecology proposes to develop it while the Agencies are
     doing the analytical work required for the RACT determinations.  Clark Decl. (ECF No. 86) ¶ O.

DEFENDANT AGENCIES' REPLY BRIEF                    14                    ATTORNEY GENERAL OF WASHINGTON
ON REMEDY PHASE                                                                    Ecology Division
                                                                                    PO Box 40117
                                                                               Olympia, WA 98504-0117
                                                                                  (360) 586-6770

1   rulemaking will encompass.  That is why the Agencies propose a period of information

2   collection before the pre-notice inquiry is filed.

3       At a minimum, the Agencies need to determine which contaminants of concern will

4   be addressed through the rulemaking process, which is Task 1b identified in the Agencies'

5   detailed task list.  Asmundson Decl. ¶¶ 13-16.  Ecology could potentially issue the pre-notice

6   inquiry earlier after completion of this particular task, but this would not shorten the overall

7   schedule because the Agencies still need enough time to do the analytical work prior to

8   issuing their proposed rules.  Clark Decl. (ECF No. 86) ¶¶ O-P.  At any rate, Ecology should

9   be given discretion to file the notice when it most makes sense, which will be during or at the

10  conclusion of information collection.  The Plaintiffs' request to have the court set an earlier

11  specific date of issuance should be rejected.

12      **4.      Plaintiffs ignore the state APA process of engaging stakeholders prior to
            proposing rules.**

13      The Plaintiffs also ignore the APA's requirement that Ecology involve its

14  stakeholders prior to publishing its proposed rules.  Wash. Rev. Code § 34.05.310(1)(a) ("To

15  meet the intent of providing greater public access to administrative rule making and to

16  promote consensus among interested parties, agencies must solicit comments from the public

17  on a subject of possible rule making before filing with the code reviser a notice of proposed

18  rulemaking[.]")  Wash. Rev. Code § 34.05.310(1)(a).  Perhaps the Plaintiffs are willing to

19  forego participation in the stakeholder process, but Ecology has many other stakeholder

20  groups that cannot be ignored in this process.  Clark Decl. (ECF No. 86) ¶ N.  The Plaintiffs'

21  disregard of Ecology's responsibility to engage the public is contrary to the APA and should

22  not be countenanced.  Also, as noted in the Agencies' opening brief, the stakeholder process

23  will run in tandem with the Agencies' analytical work and therefore will not add additional

24  time to the overall schedule.  Agencies' Opening Br. (ECF No. 83) at 9, 12, 14.

25

26

DEFENDANT AGENCIES' REPLY BRIEF                          15                          ATTORNEY GENERAL OF WASHINGTON
ON REMEDY PHASE                                                                              Ecology Division
                                                                                            PO Box 40117
                                                                                      Olympia, WA 98504-0117
                                                                                           (360) 586-6770

**C.     The Court Should Adopt The Reasonable And Workable Schedule Proposed By The Clean Air Agencies**

The Clean Air Agencies' proposal is aggressive, reasonable, and justified. The Agencies have asked for 21 months to do information collection and analytical work and an additional five months to meet all statutory rulemaking requirements prior to promulgation of a final rule—for a total of 26 months. Prior RACT determinations for sources that are notably less complex than refineries have taken longer than the 26 months proposed here. Newman Decl. ¶¶ 3-4. The Agencies' proposal does not provide any leeway for unexpected bumps in the process, such as staff turn-over or discovery of new information. Anything shorter than what is proposed here is likely not feasible.

On a final note, the Agencies are opposed to any schedule that unreasonably constrains their discretion by including specific dates for accomplishment of specific tasks. The Agencies have committed to doing this work within 26 months, and that commitment is based on their detailed task list. However, within the process, the Agencies might discover that information collection takes less time than anticipated while the air quality impacts assessment may take longer. Or the information collection process may take longer, in which case the Agencies will need to find a way to shave some time off of the other tasks. In other words, RACT determinations involve an organic process, and the Agencies will not know with certainty how long each task takes until they have entered that process.

An overall timeframe of 26 months is reasonable based on the Agencies' knowledge of what this process entails. Therefore, the Agencies request a 26 month final deadline with sufficient flexibility and discretion to work through the process. The Agencies have submitted a proposed order to the Court that would impose this timeframe.

The Agencies do not believe the Court's order should set any intermediate deadlines within the 26 month schedule. The Agencies have explained the tasks they will have to complete, but the analytical and rule development process is not amenable to being broken

DEFENDANT AGENCIES' REPLY BRIEF
ON REMEDY PHASE

16

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
(360) 586-6770

1  down into discrete components.   Nor are intermediate deadlines needed to protect the

2  Plaintiffs' interests, who in the event of unreasonable delay would have an adequate remedy

3  through an action to enforce the Court's order.   Accordingly, there is no need for the Court to

4  retain jurisdiction over this matter.  *See, e.g.,United Steelworkers*, 783 F.2d at 1120; *Natural*

5  *Res. Def. Council v. Fox*, 93 F. Supp. 2d 531, 550 n.14 (S.D. N.Y. 2000), *reversed on other*

6  *grounds*.    Should the Court nevertheless wish to track the progress of the Agencies'

7  rulemaking effort, the Agencies would be willing to file and serve status reports every six

8  months, should the Court deem that necessary.

9                          **III.   CONCLUSION**

10           The Defendant Clean Air Agencies respectfully request the Court to enter their

11  proposed order allowing 26 months for completion of the work associated with doing RACT

12  determinations for the refineries.

13           DATED this 21st day of February 2012.

14  ROBERT M. McKENNA                              MARTEN LAW PLLC
    Attorney General
15
    *s/ Laura J. Watson*                          *s/ Svend A. Brandt-Erichsen*
16  KATHARINE G. SHIREY, WSBA #35736              SVEND A. BRANDT-ERICHSEN
    LAURA J. WATSON, WSBA #28452                  WSBA #23923
17  Assistant Attorneys General                   *Attorney for Defendant Mark Asmundson*
    *Attorneys for Defendant Ted Sturdevant*      1191 Second Avenue, Suite 2200
18  P.O. Box 40117                                Seattle, WA  98101
    Olympia, WA 98504-0117                        svendbe@martenlaw.com
19  kays1@atg.wa.gov; lauraw2@atg.wa.gov          (206) 292-2600
    (360) 586-6770
20
    PUGET SOUND CLEAN AIR AGENCY
21
    *s/ Jennifer A. Dold*
22  JENNIFER A. DOLD, WSBA #23822
    *Attorney for Defendant Craig Kenworthy*
23  1904 3rd Avenue, Suite 105
    Seattle, WA 98101-3317
24  jenniferd@pscleanair.org
    (206) 343-8800
25

26

1

**PROOF OF SERVICE**

2      I hereby certify that on February 21, 2012, a copy of the foregoing document was

3  electronically filed with the Clerk of Court using the CMF/ECF system, which will send

4  notification of such filing to the following:

5
- **Svend A Brandt-Erichsen**
6       svendbe@martenlaw.com, eherlihy@martenlaw.com
- **Janette K. Brimmer**
7       jbrimmer@earthjustice.org, cmcevoy@earthjustice.org, kregan@earthjustice.org,
        chamborg@earthjustice.org
8
- **Brian W Chestnut**
9       bchestnut@zcvbs.com, bgruber@zcvbs.com, hreynolds@zcvbs.com
- **Jennifer A Dold**
10      jenniferd@pscleanair.org
- **Steven D Keeler**
11      co2truths@gmail.com
- **Jeffrey Wayne Leppo**
12      jwleppo@stoel.com, SEA_Docket@stoel.com, jashore@stoel.com
- **Joshua Osborne-Klein**
13      joshok@zcvbs.com, ckelsey@zcvbs.com, mvoege@zcvbs.com
- **Katharine G. Shirey**
14      ecyolyef@atg.wa.gov, kays1@atg.wa.gov, DanielleF@atg.wa.gov
- **Ryan P. Steen**
15      rpsteen@stoel.com, SEA_DOCKET@stoel.com, lastevens@stoel.com,
16      sdloomis@stoel.com
- **Laura J Watson**
17      lauraw2@atg.wa.gov, ecyolyef@atg.wa.gov

18      DATED this 21st day of February 2012.

19

20                                        s/ Laura J. Watson
                                          LAURA J. WATSON, WSBA #28452
21                                        Assistant Attorney General
                                          (360) 586-6770
22

23

24

25

26